UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-MJ-2835-AMS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MARCUS TALLEY,

      Defendant.

_____/

## ORDER

THIS MATTER is before the Court pursuant to the defendant's ore tenus motion for a competency determination. See Order Granting Motion for Competency Determination (DE# 7, 6/17/10). The defendant is charged by criminal complaint in the Southern District of Florida with conspiracy to commit and commission of bank robbery in violation of sections 371, 2113(a) and 2, United States Code, Title 18. See Criminal Complaint (DE# 1, 6/15/10). On October 13, 2010, the Court held a competency hearing. The government presented the testimony of Detective Robert Lanier and Dr. Lisa B. Feldman, a forensic psychologist with the Federal Bureau of Prisons. The defendant did not testify or call any witnesses. The Court admitted Government's Exhibits 1 through 4 and Defendant's Exhibits 1 and 2 into evidence.

## BACKGROUND

**A.    The Defendant's Mental Health History Prior to this Case**

The defendant has a lengthy reported history of mental illness. The defendant's initial hospitalization for psychosis was in or about February 1992, the defendant was

24 years old.[1] Government's Exhibit 2 at 45. At that time, the defendant was admitted to Jackson Memorial Hospital for "paranoia and bizarre behavior." Id. at 1, 4. The defendant was hospitalized after the defendant's mother found the defendant hiding in some hedges. Id. at 4. The defendant told his mother that someone was trying to kill him. Id. The defendant's mother believed the defendant was using cocaine at the time. Id.[2] The defendant and his mother reported a subsequent hospitalization for mental health issues in or about 1995. Id. at 4. The defendant reported a religious experience in February 1996 wherein he claimed that God revealed to him that he was the Messiah. Government's Exhibit 2 at 5. The defendant continued to report being the Messiah to prison medical staff.

The defendant was taken into custody in or about November 1996 and charged by indictment in the Northern District of Florida with: conspiracy to possess with intent to distribute crack cocaine, possession with intent to distribute cocaine base during and in relation to a drug trafficking offense, using and carrying a firearm, being a convicted felon in possession of a firearm and knowingly using and carrying a firearm. Government's Exhibit 2 at 48.

The defendant was first evaluated by medical staff at the Federal Medical Center Butner (hereinafter "Butner") in 1997. Government's Exhibit 2 at 1. The defendant underwent several psychological tests including the Wechsler Adult Intelligence Scale-

---

[1] The defendant's mother reported that the defendant had seen a school psychologist and private psychologists from a "very early age" due to "odd behavior." Government's Exhibit 2 at 4.

[2] The defendant has a long history of substance abuse including cocaine, marijuana and alcohol abuse. Government's Exhibit 2 at 3-4.

Revised (WAIS-R), the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the

Structured Interview of Reported Symptoms (SIRS). Id. at 2. The defendant achieved a

full scale score of 87 on the WAIS-R test placing him in the low average range of

intelligence. Id. at 7. On the MMPI-2 test, the defendant "over endorsed symptoms of

psychopathology" suggesting that the defendant "may have been attempting to present

himself as being in more psychological distress than he actually [wa]s." Id. The

defendant was also administered the SIRS test. "The SIRS is a structured interview

format designed to detect people who may be malingering psychotic symptoms." Id. at

8. The examiner concluded that the defendant "did not respond in a manner which

would suggest that he was faking or exaggerating psychotic symptoms." Id. The report

noted that:

> There are several factors which question the validity of [the defendant's]
> reported psychotic symptoms. First, behavioral observations of [the
> defendant] made by various staff members at th[e] Institution indicated
> that [the defendant] was able to appropriately seek out, initiate, and
> develop a peer group. Moreover, [the defendant] exhibited organized and
> goal directed thinking, had little difficulty following the rules and
> regulations of the Institution, and maintained good hygiene. Such social
> interactions are often inconsistent with a schizophrenic diagnosis.
> Although [the defendant] has endorsed intermittent auditory and visual
> hallucinations during his course at th[e] facility, he has not spontaneously
> reported these symptoms. Rather, [the defendant] endorsed them only
> when questioned in detail. Further, [the defendant] has not been observed
> responding to any internal stimuli. [The defendant] has not been
> prescribed psychotropic [medications] during this evaluation and has
> remained behaviorally stable . . . .

Id. at 9. The report further noted that "[the defendant was] diagnosed with Antisocial

Personality Disorder. People with this diagnosis tend to lie, deceive, and manipulate

people and situations to their advantage." Id. The report was unable to diagnose the

defendant with a mental illness, stating that: "[w]e are not able to firmly diagnose a

psychotic disorder, likely [s]chizophrenia, [p]aranoid [t]ype" and that "[m]alingering must also be entertained as a possibility." Id. Nonetheless, the report opined that the defendant was not competent to stand trial. Id.

In or about November 1997, the defendant was again evaluated by the medical staff at Butner. Government's Exhibit 2 at 11. After observing the defendant for approximately an additional five months, the medical staff at Butner issued a report opining that the defendant suffered from schizophrenia, paranoid type. Id. at 13. No new psychological testing was done prior to the issuance of this report. Id. at 12. The report further stated that "[d]ue to the intensity and duration of [the defendant's] psychotic symptoms, [the medical staff at Butner] no longer viewed [m]alingering as a probable diagnosis." Id. at 13.

A report dated April 28, 1998 noted that the defendant "continued to insist that he was the Messiah and [that he was above] the law, [sic] similar delusion thoughts for which he was found not competent" and that "he continue[d] to demonstrate delusional ideation of being the Messiah and being above secular court proceedings." Government's Exhibit 2 at 16.

The defendant took a number of antipsychotic medications while in custody with no marked improvement in his mental health. A report dated July 29, 1998 noted that although the defendant was taking antipsychotic medication (Haldol) "he remained preoccupied with the delusion that he [wa]s the Messiah and no court ha[d] authority over him." Id. at 21. The defendant was prescribed a new antipsychotic medication, Seroquel. However, "the medication had little impact on his mental status (psychotic condition)." Id. at 25. The defendant began taking a different antipsychotic medication,

4

Clozaril, on February 2, 1999. Id. at 29. The defendant took this medication for

approximately three months before it was discontinued due to the defendant's failure to

respond to this treatment. Id. The report noted that the defendant "remained

preoccupied with delusions of grandeur" and "continued to state no one ha[d] authority

over him." Id. The report further stated that "[d]ue to [the defendant's] lack of positive

response to different classes of antipsychotic medications, [the medical staff] no longer

believe[d] there [wa]s a substantial probability that with continued treatment [the

defendant] c[ould] be restored to competency. [The medical staff] view[ed the

defendant] as not competent and not restorable." Id. 31.

A report dated December 1, 1999 suggested that the defendant had not

undergone any new psychological testing since his initial evaluation on June 5, 1997.

Government's Exhibit 2 at 44. This report concluded that the defendant was not

competent to stand trial and that his competency could not be restored:

> With respect to competency to stand trial, it is our belief [that the
> defendant] is not competent. He does not demonstrate a factual and
> rational understanding of the proceedings against him, or an ability to
> assist in his own defense. His delusional beliefs interfere with these
> abilities, and it is felt he would use the courtroom to expound on his belief
> that no one has authority over him, and he is the Messiah. Past treatment
> with various classes of antipsychotics has been unsuccessful. It is our
> opinion that [the defendant] is not competent and not restorable.

Government's Exhibit 2 at 45.

On February 28, 2001, the defendant completed another MMPI-2 test.

Government's Exhibit 2 at 51. The report noted that "the validity scales revealed [the

defendant] endorsed items indicative of psychopathology. This may be due to [the

defendant's] exaggeration to create the impression of a severe psychological disorder

5

or it could be due to the existence of genuine pathology." Id. The report further noted that although the defendant "tended to endorse highly deviant items that are rarely endorsed by patients with a genuine psychiatric disorder," he also "consistently responded to the same types of items, as opposed to endorsing an inordinate number of items that do not typically cluster together." Id. The report found that the defendant's testing was consistent with paranoid schizophrenia. Id. at 52. However, the report suggested that the test's clinical scales be interpreted with caution. Id. at 51.

A report dated March 15, 2001 determined that the defendant could be released under a suitable conditional release plan. Government's Exhibit 2 at 53. A subsequent report dated May 8, 2002 noted that the defendant provided a social worker at Butner with a copy of his denial letter for social security income benefits and that "[t]his presented a problem for placement [because the defendant] would have no funds for payment." Id. at 58. The social worker provided the defendant with a "Reconsideration/Appeals form" and the defendant's probation officer recommended that the defendant obtain an attorney to appeal the denial of social security benefits. The probation officer "obtained information . . . and gave it to [the defendant] to pursue." Id. at 58. The defendant reported back a month later that the attorney would not assist him because he was already "in the system." Id.  The staff at Butner's attempts to place the defendant in a Florida psychiatric hospital were unsuccessful because the defendant had pending state and federal charges. Id. at 58-60. A report dated November 19, 2002 stated that the defendant was being transferred from Butner

for disciplinary reasons. Id. at 64.[3]

In January 2003, the defendant was transferred from Butner to the Federal Medical Center Devens (hereinafter "Devens"). Government's Exhibit 2 at 67. In July 2003, the defendant was transferred from Devens to the Federal Medical Center Rochester (hereinafter "Rochester") for his own safety after another inmate "admitted to staff that he intended to stab [the defendant] in the neck with a pen." Id. at 68.

In December 2003, the defendant reported that he was writing a book on the "new social control of the world." Government's Exhibit 2 at 68.[4] The defendant also reported taking medication so the medical staff would leave him alone. Id. On or about April 6, 2004, the defendant was evaluated by a risk assessment panel to determine whether the defendant continued to meet the criteria for commitment under Title 18, United States Code, Section 4246 and whether he was a candidate for conditional release. Id. at 69. The panel opined that the defendant "continue[d] to be a risk to others as a consequence of his mental illness and that continued hospitalization [wa]s recommended until appropriate state placement [wa]s available or he bec[a]me[ ] appropriate for conditional release." Id.

The defendant was again evaluated by a risk assessment panel on or about April 13, 2005. Government's Exhibit 2 at 71. The panel noted that the defendant's "mental

---

[3] The defendant was disruptive at Butner "attempting to turn other inmates against white staff and encouraging noncompliance with treatment" and "allegedly threatened to rape a staff member." Government's Exhibit 2 at 77. A report noted however that the defendant did not receive an incident report for this behavior and that this was suggestive of a lack of evidence. Id.

[4] The government has submitted some of the defendant's writings as evidence. See Government's Exhibit 2 at 148-580.

status appear[ed] unlikely to substantially improve in the foreseeable future given the plateau in his progress from mental health treatment." Id. at 75. The panel concluded that "a conditional release, under a prescribed regimen of medical, psychiatric, and psychological care would be appropriate. . . ." Id.

The defendant was again assessed on or about March 23, 2006. Id. at 76. Because the panel realized that a conditional release was unlikely to occur, it "focused on whether or not [the defendant] me[t the] criteria for commitment under Title 18, [United States Code], Section 4246." Id. at 79. The panel concluded that the defendant no longer met this criteria and that the defendant's commitment should be discontinued. "The panel's opinion largely rest[ed] on the facts that [the defendant] ha[d] not acted aggressively in recent years despite active symptoms of his mental illness and the lack of historical evidence that [the defendant's] mental illness ha[d] prompted any of his past violence." Id.

On or about August 30, 2006, the defendant submitted to a court-ordered psychological evaluation. See Government's Exhibit 2 at 87. The psychologist examining the defendant noted that as a result of the defendant's uncooperativeness it was "impossible to offer a final and firm opinion on [the defendant's] competency to proceed." Id. at 98. Nonetheless, the psychologist noted the following:

> In reviewing his lengthy file, I believe [the defendant] understands the charges against him and possible range of penalties. He understands the roles of the various participants in the judicial process. For example, it is clear that he is intelligent. It is clear that in a recent hearing before Judge Collier that [the defendant] understood Judge Collier was the judge, and recognized that he presided over the courtroom, although [the defendant], himself, was not wanting to subordinate himself to Judge Collier. Similarly, I think [the defendant] somewhat understands the roles of his attorney, the prosecution, and jury. He has a good vocabulary, so it is reasonable to

> assume that he has an adequate understanding of the nature of the adversarial process. He has a lengthy history of criminal conduct and considerable familiarity with criminal proceedings of the law. I think it is reasonable to conclude, albeit by inference, that [the defendant] is able to understand the charges and consequences of the proceedings against him.
>
> What is less clear is [the defendant's] capacity to assist properly in his defense. If given the opportunity to do so, there certainly is the possibility the [d]efendant would cooperate with his attorney, provide pertinent information to his attorney, or even knowingly enter a plea of guilty.

Id.  The psychologist also noted "the possibility that the [d]efendant [wa]s exaggerating or malingering his mental illness." Id. With respect to the possibility of malingering, the psychologist stated as follows:

> [W]hile there is no question [that the defendant] has been diagnosed by numerous evaluators as suffering from [s]chizophrenia, typically such patients respond to one of the many anti-psychotic medications which [the defendant] has been given. Given the degree of psychopathy, it is not outside the realm of possibilities that this man is no longer delusional, but is maintaining his "Messiah stance," as he appreciates it is his best option to be released from custody.

Id. at 98-99. The psychologist further stated that because the defendant was uncooperative, he was "not able to administer malingering instruments, which would allow [him] to ferret out to what extent, if any, [the defendant was] malingering." Id. at 99.[5] The psychologist noted that the defendant's "high scores on the Hare Psychopathy Check List put him in a high risk group for malingering" and that "the symptomatic picture of Schizophrenia that [the defendant] present[ed] [wa]s so atypical as to raise a red flag about its credibility." Id.

---

[5] The psychologist did not conclude that the defendant was not mentally ill. Rather, he concluded that "it [wa]s very possible that [the defendant] ha[d] improved greatly with treatment, but [wa]s trying to use his symptoms to decrease his risk of a lengthy period of incarceration." Government's Exhibit 2 at 99.

9

On or about January 23, 2007, the defendant was again evaluated by mental health professionals. The purpose of this evaluation was to "determine whether [the defendant] suffers from a mental disease or defect such that his release from custody would create a substantial risk of bodily injury to another person or serious damage to the property of another." Government's Exhibit 2 at 103. With respect to malingering, the report noted as follows: "[a]lthough [the defendant] refused to participate in formal psychological testing to assess the possibility that he was malingering, he was assessed for symptom exaggeration during a clinical interview. . . . During this line of questioning, [the defendant] endorsed few symptoms suggestive of an exaggerated or feigned presentation." Id. at 106. The report further noted that it was unlikely that the defendant's competency would be restored with continued treatment. Id. at 110. The defendant was also evaluated by a risk assessment panel. The panel found no evidence that the defendant was at a high risk of committing violent acts as a result of his mental illness and that the defendant no longer met the criteria for commitment under Title 18, United States Code, Section 4246. Id. at 111-12. On July 16, 2007, the district judge dismissed the indictment against the defendant in the Northern District of Florida.

**B.      The Defendant's Behavior While in Custody**

The defendant received several incident reports while in custody at Butner. In or about April 1997, the defendant received an incident report for "[f]ail[ing] to [r]espond to [a] [r]equest [f]rom [a] [s]taff [m]ember." Government's Exhibit 2 at 6. On that occasion, the defendant was involved in a verbal altercation with another inmate. A staff member separated the defendant from the other inmate and asked the defendant for his name

and registration number. The defendant refused to comply and stated "On who[se] authority? I am the authority, and I submit to no one." Id. at 7. On September 11, 1997, the defendant received an incident report because he refused to move to another room as requested by a correctional officer. Id. at 12. The defendant claimed he was God and did not have to follow orders. Id. On November 22, 1997, the defendant received an incident report for possessing an intoxicant. Id. at 16.

A report dated November 19, 2002 stated that the defendant was not considered a "management problem" until about June 2002. Government's Exhibit 2 at 63. At that time it was discovered that the defendant had a small group of inmates that would congregate around him, refer to him as "Israel" and that the defendant appeared to preach to them. Id. The defendant was moved to another unit after "a number of inmates placed themselves in the Restricted Housing Unit . . . and implicated [the defendant] as the reason for their fear." Id. In November 2002, the defendant was placed in the Restricted Housing Unit pending an investigation of allegations that the defendant made statements about raping a staff member. Id. Following the investigation, the defendant was transferred for disciplinary reasons to Devens. Id. at 63, 67.

A report dated April 13, 2005 noted that the defendant had received a total of six incident reports while in custody. The report indicated that the defendant was not responsible for three of these reports (two instances of being insolent and one instance of refusing to obey an order). Id. at 73. The defendant was sanctioned for the other incident reports (refusing to work, possessing intoxicants and refusing to obey an order). Id. at 73-74.

**C.      The Defendant's Arrest**

On June 10, 2010, the defendant was arrested for the instant offense. Government's Exhibit 2 at 113. Detective Robert Lanier spoke to the defendant following his arrest in the instant case. The defendant told Detective Lanier that banks were the institutions that controlled the money and therefore banks were in control of the world. The defendant talked about a new world order. The defendant told Detective Lanier that he would take misguided and misdirected youths that were involved in regular street robberies and train them to rob banks. The defendant did not tell Detective Lanier that he was the Messiah or that Detective Lanier did not have authority over the defendant.

**D.      The Defendant's Telephone Calls While in Custody**

The defendant placed numerous telephone calls to relatives while in custody for the instant offense. See Government's Exhibit 2 at Tab 24.  The defendant called his mother, father, son, daughter, common law wife and sister. In these telephone calls, the defendant identified himself as "Marcus" or "Marc" and responded to those names. He did not speak of Marcus Talley in the third person as he did with prison medical staff. In the majority of these telephone calls, the defendant did not talk about being the Messiah. There were a few telephone calls where the defendant made references to being the Messiah.

In a telephone call on June 20, 2010, the defendant stated to his son that there was nothing "they" could do to "stop the Messiah." The defendant's son laughed at this statement. It is unclear whether the defendant was joking with his son. In a later part of

the conversation the defendant again stated to his son that there was nothing "they" could do to the Messiah. The defendant also stated that he was the "anointed." The defendant relayed an altercation he had with another inmate wherein the defendant told the other inmate that he was the Christ. In a separate conversation with his common law wife on June 22, 2010, the defendant tried to reassure his common law wife that he is coming home by stating "after all, what can they do to the Messiah." The defendant acknowledged that he knew that his common law wife did not believe him and that they had this conversation "a million times." The defendant's common law wife responded, "that is what you believe, . . . I have no control over that." In a subsequent telephone call with his common law wife on June 24, 2010, the defendant stated that his "life [wa]s accomplishing the purpose that he received from God." He described this purpose as providing for his family, as a father and as a husband and "developing his own family." The defendant did not state in this conversation that his purpose was to judge others as the "Messiah" or to establish a new world order. In a telephone conversation on July 22, 2010, the defendant told his sister that God had "shown" the defendant that the government had the phones and the houses "bugged." In a telephone call with his son on July 22, 2010, the defendant stated "as the Messiah, you know I'm going to rise to the occasion." The defendant's son laughed at this statement. It is unclear whether the defendant was joking. The defendant appeared to be chuckling.

The defendant discussed his present incarceration and legal problems with relatives. In a telephone call with his common law wife on June 20, 2010, the defendant was interested in what questions the police had asked his common law wife and what items were seized from the family home. On the same day, the defendant's father

asked the defendant if he had an opportunity to speak to an attorney. The defendant responded that "a guy" had come to see him. In a telephone call with his common law wife on June 20, 2010, the defendant's common law wife asked the defendant what took place during a hearing. The defendant responded that he was just waiting to see the doctor. During a separate telephone conversation on June 20, 2010, the defendant's common law wife asked the defendant when his attorneys would return to Court. The defendant stated that he did not know but that he was told that they were waiting for the defendant to talk to the doctors and that nothing would happen until the defendant spoke to the doctors. The defendant's common law wife asked the defendant if his attorneys were public defenders or pro bono attorneys. The defendant responded "it's a private dude."

In a telephone call on July 19, 2010, the defendant's father told the defendant that he spoke to the defendant's counsel about the government's intent to seek a sentence of life imprisonment against the defendant. The defendant's father discussed with the defendant his future plans to visit the defendant's attorney to discuss the case. The defendant reported to his father that his lawyer had come to see him in prison. In a telephone call on July 23, 2010, the defendant's father informed the defendant that he was unable to meet with the defendant's attorney and that they had rescheduled the meeting. The defendant acknowledged that the lawyer visited him that week. The defendant stated "I don't look at those guys as being no lawyer to me." The defendant further stated that he took whatever information his lawyer brought him "just to keep an eye on his enemy." In a telephone call on July 29, 2010, the defendant's father told the defendant that he had spoken with the defendant's lawyer and that the government was

14

having a difficult time getting an indictment against the defendant because the defendant was incompetent.

While incarcerated at the Federal Detention Center, the defendant expressed concern over normal, every day problems. On multiple occasions the defendant expressed concern about managing the allotted 300 minutes of telephone calls he is allowed to make per month. See, e.g., Telephone call on June 22, 2010. The defendant was concerned about his mother's health. See, e.g., Telephone call on June 25, 2010. The defendant expressed an interest in his then-pregnant common law wife's well-being, whether she was eating and whether she had gone to the doctor. See, e.g., Telephone call on June 22, 2010. The defendant talked about his newborn son and expressed concern for his well-being. See, e.g., Telephone call on August 8, 2010. The defendant also exhibited concern over paying the bills. See, e.g., Telephone call on June 25, 2010. In several telephone calls, the defendant was able to give instructions to family members. He told his common law wife how to pay bills and how to add money to his prison account. See, e.g., Telephone calls on June 22 and 25, 2010. The defendant also gave his common law wife detailed directions to the Federal Detention Center so that she could visit him. See Telephone call on August 4, 2010. In a telephone call on July 2, 2010, the defendant even discussed the need for a power of attorney for his common law wife.

## E.    The Defendant's Co-Conspirators

The defendant told two co-conspirators that if they were caught by law enforcement, they should act crazy to avoid prison time. Government's Exhibit 1 at 19. The defendant stated that he had "beaten" prior federal charges by acting as if he were

15

insane. Id. The defendant engaged in role-playing exercises wherein the co-conspirators would act as if they were being questioned by police and would behave as if they were mentally ill. Id.

**F.     The Defendant's Writings**

Law enforcement officers recovered voluminous writings belonging to the defendant when they executed a search warrant at the defendant's residence. Government's Exhibit 2 at 148-583. The defendant's writings discussed the defendant's plans for establishing a new court system, the purpose of that court and how the court should be administered. Id. at 200. The defendant also discusses the establishment of the "Urban Guerilla Syndicate" an organization akin to an "underground paramilitary group." Id. at 150. The purpose of this group was to "gain[ ] control of an economic base suitable to create a condition of prosperity for its[ ] membership." Id. One of the stated requirements of the Urban Guerilla Syndicate was to "maintain a prison out-reach program, including contacts with attorneys and bondsmen." Id. at 152.

**G.     Dr. Feldman's Report**

In June and July 2010, Dr. Lisa B. Feldman, a forensic psychologist with the Bureau of Prisons, and other BOP staff evaluated the defendant. The purpose of the evaluation was to render an opinion on the defendant's competency to stand trial. Dr. Feldman and other BOP staff interviewed the defendant, reviewed the defendant's mental health records, listened to recorded telephone calls the defendant placed to family members while incarcerated at the Federal Detention Center in Miami and

16

administered a series of tests.[6]

Dr. Feldman and BOP staff administered the following tests: the Booklet Category Test - Second Edition (BCT), the Personality Assessment Interview (PAI) and the Georgia Court Competency Test - Mississippi State Hospital (GCCT-MSH). The BCT is "designed to detect the presence of neuropsychological impairment such as that found in brain injuries." Government's Exhibit 1 at 22. The defendant had an average score which suggested that the defendant did not suffer from gross neurocognitive deficits. Id. Additionally, the defendant "elevated one of the indices suggestive of the exaggeration of neurocognitive impairment." Id. The PAI provides information relevant to diagnosing psychopathology. The defendant's "response style on the PAI reflected . . . an attempt to present himself in a favorable light and deny relatively minor faults" and "suggested overt efforts to distort the profile." Id. at 23. The GCCT-MSH is a test that is "specifically designed to assess relevant psycho-legal knowledge." Id. at 27. Dr. Feldman noted that "the defendant obtained a score that is consistent with that of individuals feigning incompetence." Id.

On August 4, 2010, Dr. Feldman submitted a report to the Court. See Government's Exhibit 1. In this report, Dr. Feldman opined that "it is likely that the defendant is presently malingering psychiatric symptoms in an effort to receive reduced or no legal repercussions for his alleged criminal behavior." Id at 24. Notwithstanding Dr. Feldman's opinion that the defendant was malingering, she did not rule out the

---

[6] Dr. Feldman's report notes that the defendant "was subtly argumentative and only willing to engage in testing and interviews, of his own choosing. As the evaluation period continued, the defendant became increasingly uncooperative and ultimately refused all contacts with examiners." See Government's Exhibit 1 at 3.

possibility that the defendant suffers from a legitimate psychiatric illness. <u>Id.</u> at 25. Dr.

Feldman noted that "co-occurrence of malingering with a genuine condition [of

psychiatric illness] is common." <u>Id.</u> Dr. Feldman concluded that "[t]here is no evidence

that [the defendant] is currently experiencing the active phase of a mental disorder that

would render him unable to understand the nature and consequences of the

proceedings against him. . . ." <u>Id.</u> at 28. Dr. Feldman also concluded that "[the

defendant] has the capacity to assist his attorney in his own defense, if motivated to do

so." <u>Id.</u>

## LEGAL STANDARD

The Court is required to hold a competency hearing "if there is reasonable cause

to believe that the defendant may presently be suffering from a mental disease or

defect rendering him mentally incompetent to the extent that he is unable to understand

the nature and consequences of the proceedings against him or to assist properly in his

defense." 18 U.S.C. § 4241(a). "The legal test for competency is whether the defendant

had 'sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding' and whether he had 'a rational as well as factual understanding

of the proceedings against him.'" <u>United States v. Cruz</u>, 805 F.2d 1464, 1479 (11th Cir.

1986) (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960)).

Section 4241 provides that either party "may file a motion for a hearing to

determine the mental competency of the defendant." 18 U.S.C. § 4241(a). It is unclear

which party has the burden of proof under 18 U.S.C. § 4241. <u>See</u> <u>United States v.</u>

<u>Rothman</u>, No. 08-20895-CR, 2010 WL 3259927, *6, n. 4 (S.D. Fla. Aug. 18, 2010)

(finding that although section 4241 "does not speak in terms of whether the government

18

or defendant has the burden of proof; it only mandates that whoever is seeking to prove incompetence has the burden."); but see United States v. Richardson, 3:08-cr-302-J032TEM, 2009 WL 1490552, * 3 (M.D. Fla. May 27, 2009) (observing that "[w]hich party has the burden of proof concerning competency is not fully decided" and noting that "[s]ection 4241 does not . . . assign the burden of proof to either the prosecution or the defense.").

    In United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976),[7] the former Fifth Circuit stated that "[t]here can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial at the § 4244[8] hearing or its nunc pro tunc substitute." However, in United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir. 2006), the Eleventh Circuit stated in dicta that "the relevant competency statute [18 U.S.C. § 4241] arguably contemplates that the burden will lie with the party making a motion to determine competency." Here, the defendant made an ore tenus motion to determine competency. See Order Granting Motion for Competency Determination (DE# 7, 6/17/10). Izquierdo distinguished Makris because it was based on section 4244 and because Makris involved the government's pretrial motion to determine the competency of the defendant. Izquierdo held that the district court did not err in placing the burden of proof on the defendant where the defendant

---

    [7]  The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

    [8]  "In 1984, 18 U.S.C. § 4244 was replaced by 18 U.S.C. § 4241." United States v. Izquierdo, 448 F.3d 1269, 1278, n. 8 (11th Cir. 2006).

sought to withdraw his guilty plea due to incompetency. Id. at 1278. Based on the

narrow holding of Izquierdo and because Izquierdo did not overrule Makris, the

undersigned will place the burden of proof on the government. The undersigned notes

that in the instant case, placing the burden of proof on the government does not affect

the outcome of these proceedings. Preponderance of the evidence is the legal standard

in determining the defendant's competency. 18 U.S.C. § 4241(d).

## DISCUSSION

**1.    The Defendant Has a Rational as Well as Factual Understanding of the Proceedings Against Him**

Under the first prong, the defendant must be able to understand the nature and

consequences of the proceedings against him. The defendant has previously been

diagnosed with schizophrenia, paranoid type.[9] See, e.g., Government's Exhibit 2 at 52.

At the competency hearing, Dr. Feldman opined that someone with schizophrenia,

paranoid type could still be competent to stand trial. "[T]he mere presence of a mental

disease or defect is not sufficient to render a defendant incompetent . . . ." United

---

[9] In the instant case, the defendant's schizophrenia manifested itself in a belief that he was the Messiah, and as a result, no court had authority over him. The Court notes that there is substantial reason to doubt this diagnosis. Although the defendant has a lengthy medical history wherein he was diagnosed as suffering from schizophrenia, paranoid type, several reports noted the possibility that the defendant was either malingering or exaggerating his mental illness. See, e.g., Government's Exhibit 2 at 7, 9. Additionally, the defendant completed two tests, the Booklet Category Test Second Edition and the Georgia Court Competency Test - Mississippi State Hospital, which were suggestive of possible malingering. See Government's Exhibit 1 at 22, 27. In fact, two co-defendants stated that the defendant told them that he previously acted crazy in order to successfully "beat" federal charges. Even if the defendant truly believed he was the Messiah, this belief alone would not be sufficient to render him incompetent. United States v. Rothman, No. 08-20895-CR, 2010 WL 3259927, at *7 (S.D. Fla. Aug. 18, 2010) (citation omitted) (noting that the mere presence of a mental illness is insufficient to render a defendant incompetent).

States v. Rothman, No. 08-20895-CR, 2010 WL 3259927, at *7 (S.D. Fla. Aug. 18, 2010) (citing United States v. Liberatore, 856 F.Supp. 358, 360 (N.D. Ohio 1994)). "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." United States v. Williams, No. 5:06-cr-36-Oc-10GRJ, 2007 WL 1655371, at * 5 (M.D. Fla. Jun.7, 2007) (internal citation and quotation marks omitted); see also Medina v. Singletary, 59 F. 3d 1095, 1107 (11th Cir. 1995) (noting that "not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted).

The government has established by a preponderance of the evidence that the defendant has a rational as well as factual understanding of the proceedings against him. The defendant has been involved in the criminal justice system for a substantial period of time. The defendant appreciates the allegations against him and the nature of possible penalties that can be imposed if he is found guilty of the instance offense. The defendant recruited others to participate in crimes and explained to them that if they were caught they should act crazy in order to "beat" federal charges. The defendant's own writings, although bizarre, suggest that he has an understanding of how the Court system works. The defendant's recorded telephone conversations with family members show that the defendant is aware of the legal proceedings against him. The defendant understands the adversarial nature of the instant proceedings. The defendant acknowledged that a private attorney had been appointed to represent him in the

21

instant case and that this attorney has come to visit him several times. Thus, the Court finds that the government has satisfied its burden of proof as to this prong.

## 2. The Defendant has Sufficient Present Ability to Consult with His Lawyer with a Reasonable Degree of Rational Understanding

The undersigned concludes by a preponderance of the evidence that the defendant has sufficient present ability to consult with his lawyer within a reasonable degree of rational understanding. The Court credits Dr. Feldman's opinion that the defendant could provide assistance to his attorney if properly motivated. Government's Exhibit 1 at 28. Dr. Feldman determined that the defendant was malingering his mental illness. Dr. Feldman's malingering diagnosis is supported by the record. Two co-conspirators stated that the defendant told them that if they were caught by law enforcement that they should act crazy to avoid prison time and that the defendant had previously "beaten" federal charges by acting crazy.[10] In recorded telephone calls with family members, the defendant identified himself as "Marc" or "Marcus" and responded to those names. The defendant did not refer to "Marcus Talley" in the third person and generally did not tell others that he was the Messiah[11] and that his mission is to establish a new world order. Additionally, two of the defendant's test scores were suggestive of exaggeration or fabrication of psychiatric problems.[12]

_____

[10] The government introduced the statements of the co-conspirators through the testimony of Dr. Feldman.

[11] There are a few telephone conversations where the defendant states that he is the Messiah. See, supra. However, in the majority of these telephone conversations the defendant does not mention his messianic beliefs.

[12] The defendant completed two tests, the Booklet Category Test Second Edition and the Georgia Court Competency Test - Mississippi State Hospital, which were

Dr. Feldman's malingering diagnosis is also bolstered by the fact that the defendant expressed concern over every day problems. In recorded telephone calls, the defendant was concerned about his mother's health, his common-law wife's well-being and the well-being of his newborn son. The defendant also expressed concern over paying the bills and managing the allotted 300 minutes of telephone calls he was permitted per month. The defendant provided detailed instructions to his common law wife on several occasions. These telephone calls reveal that the defendant has an appreciation for what is currently happening in his life and that he is capable of providing detailed instructions to others for his own benefit and for the benefit of his family.[13] The defendant did not have any difficulty discussing with family members his current legal problems. In a telephone call on June 20, 2010, the defendant expressed an interest in the questions police officers asked his common law wife and what evidence was seized from the residence. Thus, the undersigned concludes that the defendant has the capacity to communicate and disclose pertinent information to his attorney and to assist appropriately in his own defense. The undersigned observed the defendant for several hours during the competency hearing and finds that the defendant is capable of exhibiting appropriate courtroom behavior.  Accordingly, the Court finds by a preponderance of the evidence that the defendant is competent and able to properly assist in his defense if motivated.

_____

suggestive of possible malingering. <u>See</u> Government's Exhibit 1 at 22, 27.

[13] In fact, while the defendant was previously in custody he was able to apply for social security income benefits and appeal the denial of those benefits.

## CONCLUSION

Based on the foregoing, the Court finds by a preponderance of the evidence that the defendant has a rational as well as factual understanding of the proceedings against him and that he has sufficient present ability to consult with his attorney within a reasonable degree of rational understanding. Accordingly, the undersigned finds that the defendant is competent to stand trial as provided in 18 U.S.C. § 4241.

DONE AND ORDERED, in Chambers, at Miami, Florida, this **18th** day of November, 2010.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
All Counsel of Record